```
UNITED STATES DISTRICT COURT              (ECF)
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - -:
IRONSHORE INSURANCE LIMITED,      : 11 Civ. 5954 (LTS) (JCF)
                                  :
                                  :        MEMORANDUM
               Plaintiff,         :        AND  ORDER
                                  :
     - against -                  :
                                  :
WESTERN ASSET MANAGEMENT COMPANY, :
                                  :
               Defendant.         :
- - - - - - - - - - - - - - - - - - -:
JAMES C. FRANCIS IV
UNITED STATES MAGISTRATE JUDGE
```

Plaintiff Ironshore Insurance Ltd. ("Ironshore") brings this action against defendant Western Asset Management Company ("Western") for breach of contract and breach of fiduciary duty. The parties have exchanged initial and rebuttal expert reports; Ironshore now seeks leave to serve two reply reports to respond to matters Western allegedly raised for the first time in its rebuttal reports and to amend charts attached as exhibits to one of its initial reports.  For the reasons that follow, the plaintiff's application is granted in part and denied in part.

Background

On February 21, 2007, Ironshore, a broker-sourced insurance company, and Western, an investment adviser, entered into an Investment Management Agreement (the "IMA"), under which Ironshore granted Western "sole power" over Ironshore's $520 million limited

duration fixed income portfolio (the "Portfolio"), subject to the terms of the IMA. (Amended Complaint ("Am. Compl."), ¶¶ 11, 12, 26, 28-29). Western's investment decisions were constrained by the Recommended Limited Duration Fixed Income Investment Guidelines ("Investment Guidelines"), which were incorporated into the IMA. (Am. Compl., ¶ 30). Ironshore alleges that Western breached its contractual and fiduciary duties under the IMA, "[m]ismanaging the Portfolio by . . . concentrating the Portfolio in impermissibly risky, illiquid, and volatile securities, failing to diversify risk exposures, and ignoring relevant market information." (Am. Compl., ¶¶ 83, 89). Ironshore terminated the IMA on May 20, 2008, after sustaining an unrealized loss of approximately $55.5 million, and by the end of 2008, Ironshore's net realized and unrealized losses exceeded $130 million. (Am. Compl., ¶¶ 71-74).[1]

The parties exchanged discovery pursuant to a Pretrial Scheduling Order issued by the Honorable Laura Taylor Swain, U.S.D.J. (Order dated Nov. 4, 2011 ("Order")). The Order provided for a simultaneous exchange of initial expert reports "on issues as to which [ea]ch party has the burden of proof or otherwise in support of the party's case," to be followed by "[r]ebuttal

---

[1] The factual background of this action is more fully set forth in Ironshore Insurance Ltd. v. Western Asset Management Co., No. 11 Civ. 5954, 2012 WL 1981477 (S.D.N.Y. May 30, 2012).

disclosures." (Order at 1-2). The Order did not provide for the exchange of reply reports. For Ironshore, David K.A. Mordecai and Daniel I. Castro submitted initial and rebuttal reports; Avram S. Tucker and Erik R. Sirri submitted initial reports for Western, and, along with Keith M. Schappert and Paul Jablansky, submitted rebuttal reports.

Ironshore's experts concluded that Western's construction of the Portfolio exposed Ironshore to undue risks, in violation of Western's contractual and fiduciary duties. (Expert Report of David K.A. Mordecai dated March 1, 2013 ("Mordecai Report") at 9; Expert Report of Daniel I. Castro, Jr. dated March 2, 2013 ("Castro Report") at 10). In particular, the experts assert that (1) Ironshore's business as a property and casualty insurance company dictated construction of a conservative portfolio; (2) despite Ironshore's communication of the desired characteristics to Western, the Portfolio exposed Ironshore to undue credit, extension, and liquidity risks; and (3) the Portfolio, designed to have risk characteristics approximating the Treasury Benchmark, was inadequately diversified and resulted in substantial underperformance relative to the Treasury Benchmark. (Mordecai Report at 9; Castro Report at 10).

In response, Western's experts concluded that Western's construction and management of the Portfolio conformed to industry

practice and to Ironshore's objectives stated in the IMA and the Investment Guidelines.   In particular, they assert that (1) the risk profile of the Portfolio was consistent with that of investment holdings of other investors similar to Ironshore (Expert Report of Keith M. Schappert dated April 29, 2013 ("Schappert Rebuttal") at 42); (2) the IMA and the Investment Guidelines, rather than the standards used by Ironshore's experts, provide the proper standard to evaluate the Portfolio (Schappert Rebuttal at 12); and (3) Western could not have constructed a less risky portfolio that could have achieved Ironshore's stated objective of outperforming the Treasury Benchmark by 50 points (Schappert Rebuttal at 45-46).   Ironshore contends that these arguments are raised for the first time in Western's rebuttal reports and seeks leave to file reply reports to respond to them.

Discussion

"It is routine that the party with the burden of proof on a particular issue be the first to submit its expert reports addressing the issue.   The other party then is given the opportunity to submit a rebuttal report and, if requested and allowed by the Court, a reply expert report may follow." Sandata Technologies, Inc. v. Infocrossing, Inc., Nos. 05 Civ. 9546, 06 Civ. 1896, 2007 WL 4157163, at *1 (S.D.N.Y. Nov. 16, 2007) (citing Fed. R. Civ. P. 26(a)(2)); accord Lidle v. Cirrus Design Corp., No.

4

08 Civ. 1253, 2009 WL 4907201, at *4 (S.D.N.Y. Dec. 18, 2009).

Reply expert reports may be appropriate if the rebuttal reports raise new matters not discussed in the initial reports. See Lidle, 2009 WL 4907201, at *4. Such reply reports, if allowed, should be "'confined to new matters adduced by the defense and not to repetition of the plaintiff's theory of the case.'" Id. (quoting Brune v. Time Warner Entertainment Co., No. 02 Civ. 5703, 2004 WL 2884611, at *2 (S.D.N.Y. Dec. 14, 2004)). "It is not an opportunity for the correction of any oversights in the plaintiff's case in chief." Crowley v. Chait, 322 F. Supp. 2d 530, 551 (D.N.J. 2004) (internal quotation marks and citations omitted). Thus, I turn to whether the defendant's experts raised any new points not discussed in the plaintiff's initial expert reports.

A.   Investment Holdings of Other Insurance Companies

Ironshore claims that Western's experts improperly address investment holdings of insurance companies other than Ironshore. (Letter of Thorn Rosenthal dated May 3, 2013 ("Rosenthal Letter") at 3). In their rebuttal reports, Western's experts contend that other similarly-situated insurance companies held the same, similar, or even more risky securities (Schappert Rebuttal at 50-52), and conclude that Ironshore's status as an insurer by itself conveys no information about whether the securities that Western purchased were too risky (Expert Rebuttal Report of Professor Erik

R. Sirri dated April 29, 2013 ("Sirri Rebuttal") at 42; Schappert Rebuttal at 42-45).

This is not a new issue. Ironshore's experts concluded in their initial reports that Western purchased securities that were too risky for a property and casualty insurance company such as Ironshore. Dr. Mordecai explained that the nature of the business of property and casualty insurance companies "necessitates more liquid, lower volatility, shorter weighted average life investments." (Mordecai Report at 10-12). And Mr. Castro opined that certain bonds in the Portfolio "were totally unsuitable for a property and casualty insurance company which required safe and liquid investments." (Castro Report at 50).

Western's rebuttal reports were limited to the same subject matters encompassed in Ironshore's initial reports, which included the issue of whether the Portfolio was suitable for Ironshore, given its status as a property and casualty company. See United States v. Casamento, 887 F.2d 1141, 1172 (2d Cir. 1989) ("The function of rebuttal evidence is to explain or rebut evidence offered by the other party."). The rebuttal reports sought to "explain, repel, counteract or disprove the evidence of the adverse party" by pointing to other similarly-situated investors, S.W. v. City of New York, No. 2009 CV 1777, 2011 WL 3038776, at *2 (E.D.N.Y. July 25, 2011) (internal quotation marks omitted), not to

present new arguments, see Ebbert v. Nassau County, No. 05 CV 5445, 2008 WL 4443238, at *13 (E.D.N.Y. Sept. 26, 2008) ("A rebuttal expert report is not the proper place for presenting new arguments, unless presenting those arguments is substantially justified and causes no prejudice.") (internal quotation marks omitted).

   B.   Investment   Management   Agreements   and   Investment
        Guidelines

     Ironshore contends that one of Western's experts, Mr. Schappert,[2] raises a new point regarding the importance of the IMA and the Investment Guidelines. (Rosenthal Letter at 3). In his rebuttal report, Mr. Schappert opines that Ironshore's experts used improper standards to conclude that Western breached its obligations and that they should have used the standards set forth in the IMA and the Investment Guidelines. (Schappert Rebuttal at 11-26).

     The IMA and the Investment Guidelines are central to Ironshore's claims against Western. (Am. Comp., ¶¶ 83, 89). Ironshore's relationship with Western is based on the IMA and the Investment Guidelines, and Ironshore brought this action against Western for breach of contract. (Am. Compl., ¶¶ 26, 28-30, 83,

---

     [2] Ironshore identifies this expert only as "[o]ne of Westerns experts . . . who did not submit an opening report." (Rosenthal Letter at 3). I assume that Ironshore is referring to Mr. Schappert, who did not submit an opening report and offered his opinion on the importance of the IMA in the rebuttal report.

89).   Thus, Ironshore bears the burden of proof on the issues on the nature and scope of Western's obligations under the IMA and Investment Guidelines and whether Western breached these obligations.   Indeed, Ironshore's experts concluded that Western breached its obligations to Ironshore by investing in risky securities.   (Mordecai Report at 9; Castro Report at 10).   In response to this assertion, Mr. Schappert addressed what obligations were imposed on Western by the IMA and the Investment Guidelines, which he contends were misconstrued by Ironshore's experts.   (Schappert Rebuttal at 11-26).

   To the extent that Ironshore believes that it has not addressed the importance of the IMA, which set forth the "sole standard of care" by which Western's conduct is to be judged (Investment Management Agreement dated Feb. 21, 2007, attached as Exh. B to Am. Compl., § 3), it should not now be afforded an opportunity to address an issue it had ample opportunity to explore in its initial reports, see Lidle, 2009 WL 4907201, at *5 (rejecting plaintiff's reply report where "[t]here is no reason [plaintiffs' expert] could not have conducted those tests before his initial report was drafted, and plaintiffs' gamesmanship in this regard is precisely what the Rules were intended to prevent").

   C.   Performance Objective

   Ironshore contends that Western improperly argues in rebuttal

8

that it would have been inconsistent with the Investment Guidelines, especially the target return of 50 basis points above the Treasury Benchmark, for the Portfolio to contain less risky securities. (Rosenthal Letter at 3; Schappert Rebuttal at 46). Ironshore now seeks to provide a hypothetical portfolio that would have been consistent with the targeted return but would not have contained a concentration of risky securities. (Rosenthal Letter at 3).

Again, Western's expert was responding to Ironshore's contention that specific securities that Western purchased were too risky. It sought to explain that the types of securities that Western purchased were consistent with achieving the "performance objective[]" stated in the Investment Guidelines (Schappert Rebuttal at 46), "for the purpose of rebutting or critiquing the opinions of [the plaintiff's] expert[s]," Park West Radiology v. CareCore National LLC, 675 F. Supp. 2d 314, 326 (S.D.N.Y. 2009). This is not a new argument, and no reply is warranted.

D.   Liquidity Profile

Ironshore contends that Mr. Schappert improperly asserts that "'Western made sure it understood the liquidity profile of its investments, [and] whether that liquidity profile was appropriate for its customers.'" (Rosenthal Letter at 3, quoting Schappert Rebuttal at 39).

9

However, Ironshore's initial expert reports had addressed the "liquidity profile" of the investments made by Western.  Dr. Mordecai's initial report includes a section titled "Liquidity Risks," in which he contends that certain "holdings of subordinate, alternative, and limited issuance securities" rendered Western's portfolio "unduly exposed to liquidity risk." (Mordecai Report at 20).  Mr. Schappert only responded to Ironshore's experts by asserting that Western considered several factors in selecting corporate bonds, including liquidity profile of its investments. (Schappert Rebuttal at 39).  This served to explain or disprove Ironshore's experts' opinions, not to present a new issue.

E.   Incomplete Information Produced by Western

Ironshore contends it learned through an exhibit to one of Western's rebuttal reports that Western's prior document productions did not include monthly reports for two accounts (nos. 1487 and 2354). (Rosenthal Letter at 3; Letter of Carl Moor dated May 7, 2013 ("Moor Letter") at 6).  It seeks to revise charts attached as exhibits 2 and 3 to Dr. Mordecai's rebuttal report which refer to accounts in Western's US Limited Duration F&O Composite (the "F&O Composite") in the period between March 31, 2007, and April 30, 2008. (Rosenthal Letter at 3; Moor Letter at 6).  Only account no. 1487 was in the F&O Composite in the time period referenced in the exhibits, and Western had previously

10

produced monthly holdings for that account.[3] (Moor Letter at 6). Nevertheless, there is no showing of undue delay or bad faith on the part of Ironshore, and no prejudice to Western would result from allowing Ironshore to amend these charts to reflect more complete and accurate information.   Therefore, Ironshore's application to amend its exhibits is granted to the extent it may incorporate account no. 1487.[4]

Conclusion

For the reasons discussed, the plaintiff's motion is denied except to the extent that it may amend exhibits 2 and 3 to Dr. Mordechai's rebuttal report.   Of course, Ironshore can depose Western's experts or cross-examine them at trial with respect to the basis for their opinions.

                    SO ORDERED.

                    _James C. Francis IV_
                    JAMES C. FRANCIS IV
                    UNITED STATES MAGISTRATE JUDGE

Dated: New York, New York
       May 15, 2013

_____

    [3] Western's counsel represents that monthly holdings for account no. 1487 were produced on October 18, 2012, under Bates numbers WAMIS00749531-36.  (Moor Letter at 6).

    [4] Western has now fully produced information regarding account no. 2354, but this additional information does not affect Dr. Mordecai's charts because it was not included in the F&O Composite until May 2008, after the time period referenced in the charts.

Copies mailed this date to:

Thorn Rosenthal, Esq.
Ben A. Schatz, Esq.
David G. Januszewski, Esq.
Cahill Gordon & Reindel LLP
80 Pine Street
New York, NY 1005

Avi Braz, Esq.
Carl H. Moor, Esq.
Hailyn J. Chen, Esq.
Ronald K. Meyer, Esq.
Sean Eskovitz, Esq.
Munger, Tolles & Olson LLP
355 South Grand Ave., 35th Floor
Los Angeles, CA 90071

Brian Douglas Hail, Esq.
Nomi Berenson, Esq.
Goodwin Procter, LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018-1405

12